EVERARD S. CHILD, APPELLEE, v. JESSIE D. BAKER, APPELLANT.

1. **Deeds:** WITNESSES. Section 1 of chapter 73, Compiled Statutes, which provides that "Deeds of real estate, or any interest therein in this state, except leases for one year, or for a less time, if executed in this state, must be signed by the grantor or grantors, being of lawful age, in the presence of at least one competent witness, who shall subscribe his or her name as a witness thereto," etc, *Held*, To require that such witness be without a direct, certain, legal interest in such deed.

2. **The evidence** in the case, *Held*, To sustain the findings and judgment.

Child v. Baker.

APPEAL from the district court of Furnas county. Heard below before COCHRAN, J.

*J. A. Dudgeon* (*E. W. Metcalf with him*), for appellant.

*W. S. Morlan,* for appellee, cited: 1 Devlin on Deeds, Sec. 476, p. 470.

COBB, J.

This was an action in the nature of an action *quia timet.*

The plaintiff, by his amended and supplemental petition, alleged that, on the 2d day of May, 1884, one Melancthon Wing having, previous to the 15th day of June, 1880, made homestead entry under the laws of the United States upon the south-west quarter of section seventeen, in township three north, of range twenty-four west, in Furnas county, and having prior to said 2d day of May made application to make final proof and payment on said land, by virtue of the act of congress of June 15, 1880, commonly known as the abandoned homestead act, for a valuable consideration agreed to sell and convey all his right, title, and interest in and to the above described land, and all right, title, and interest he might thereafter acquire in, or to, said land, by virtue of said act of congress, to the plaintiff, and thereupon, on said 2d day of May, said Melancthon Wing and Elnola Wing, his wife, in pursuance of said agreement and sale, executed and delivered a quit-claim deed, and remised, released, and quit-claimed unto the plaintiff all the right, title, interest, estate, and claim of the said Melancthon Wing and Elnola Wing, his wife, in and to said real estate, which said deed was entered upon the numerical index and filed for record in the office of the county clerk of Furnas county on the 3d day of May, 1884, and duly recorded. And the said Melancthon Wing, having made proof under said application, and

said act of congress being fully complied with, and having established his right to said land, and that he was entitled to a patent therefor, and said proof being accepted by the register and receiver of the land office, the usual duplicate receipt of the receiver of the land office duly issued to said Melancthon Wing on the 22d day of May, 1884, which said duplicate was duly entered on the numerical index and filed for record in the office of the county clerk of said county on the 27th day of May, 1884, and duly recorded. And that after the record of said duplicate receipt a patent from the United States for said land was duly issued to said Melancthon Wing, which said patent was dated the 10th day of September, 1886; that on the 24th day of May, 1884, said Melancthon Wing and his wife executed and delivered to the said plaintiff a warranty deed, conveying the above described real estate to the plaintiff, which said last mentioned deed was entered upon the numerical index and filed for record in the office of the county clerk of Furnas county on the 27th day of May, 1884. That the plaintiff, at the date of said deed, purchased said property of the said Melancthon Wing for the sum of $286 in cash, and received said deeds as a conveyance of the same without any notice or knowledge that the defendant or any other person claimed any interest or title to said land, other than conveyed to plaintiff by the deeds above set forth; that immediately after the purchase of said plaintiff, he took possession of the same, and the said premises have been in the actual use and occupation and possession of the plaintiff ever since the said purchase, and plaintiff has made valuable improvements thereon; that on the 12th day of June, 1884, the defendant, Jessie D. Baker, intending to injure the plaintiff and cloud his title to said land, filed in the office of the county clerk of said Furnas county a certain fraudulent and forged deed, purporting to be signed by said Melancthon and Elnola Wing, his wife, containing the usual covenants of warranty and purporting to convey the

above described premises to said Jessie D. Baker; said deed was entered upon the numerical index and filed for record in the office of the county clerk of said Furnas county and duly recorded. Said forged deed bears date and purports to have been executed and acknowledged on the 13th day of February, 1884. The said Jessie D. Baker now sets up and claims title to said premises against the plaintiff, and claims said deed is a valid and a superior title to that of the plaintiff, but refuses to commence an action at law to try her title to the same; that said deed so fraudulent and forged is a cloud upon plaintiff's title, and greatly depreciates the value of said land. With prayer for judgment, etc.

The defendant filed her answer, in which she denies each and every allegation of the petition. And for a second and further defense, she alleges, that on the 13th day of February, 1884, one Melancthon Wing and Elnola Wing, who were the owners of the land mentioned in the plaintiff's petition, sold and conveyed said real estate by deed of general warranty to the defendant, for a valuable consideration, which was paid them by defendant; that plaintiff, with notice of the execution of this deed to defendant, and for the purpose of cheating and defrauding this defendant, procured said Wing to execute a deed to plaintiff to said real estate, well knowing that the said Wing had conveyed all his interest in said real estate prior to the time of making said deed to plaintiff; that plaintiff caused said deed to be recorded in the office of the county clerk of Furnas county, and that said deed is a cloud on defendant's title to said real estate. With prayer for judgment, etc.

There was a reply by the plaintiff, denying all of the allegations of the answer.

There was a trial to the court, with a general finding and judgment for the plaintiff.

There was no evidence of actual possession of the land, or of improvements thereon by either party.

Owing to the peculiar facts of this case, the evidence on the part of the defendant will be first examined and considered, and as preliminary thereto it must be stated that the defendant, in her own right, makes no proof of title to the land, but Joseph A. Dudgeon appears to have purchased the land, or to have entered into a contract for its purchase, from Melancthon Wing, the original homesteader, in the name of the defendant, but really for his own use and benefit, and he introduced in evidence a deed of the land, bearing date February 13, 1884, executed and acknowledged by Melancthon Wing and Elnola Wing to Jessie D. Baker, for the consideration of four hundred dollars. This deed is witnessed by J. A. Dudgeon, sole witness, and the certificate of acknowledgment is signed by J. A. Dudgeon, notary public.

It appears that Melancthon Wing had made a homestead entry of the land in question on the 15th day of June, 1880, and one Hermann Albright had filed a contest of his right to perfect said homestead entry, so that at the date of said deed, had it not been for the pendency of said contest, it would have been competent for Wing to commute his homestead into a cash entry, and so perfect his title.

Joseph A. Dudgeon, as a witness on the part of the defendant, testified that he resides at Arapahoe, Furnas county, and did so reside on the 13th day of February, 1884; that on the 12th day of February, 1884, Mr. Wing came to the office of witness, told him that his name was Melancthon Wing, that he had a government homestead, describing it, that he had stopped at the United States land office at Bloomington on his way back from Iowa, where he had been for several months, having his. eyes doctored, that he saw the register of the land office and enquired about his land just named, that the register told him his land was in a contest, and the decision had passed that office without any appeal on his part, and gone to the commissioner of the general land office, etc.; that a cash

proof could be made on the land, but he, Wing, said, "I haven't money to do anything with," and he said, "I would a little rather you would do this way: I would rather sell the land, or whatever interest I have in it, to some one else, and in that way get a little money to help myself with, and start again." "He further asked me," said the witness, "if I knew of any one who would be likely to buy his interest in the land, as it stood at that time; I asked him what he considered his interest, as it stood, worth, and he said he thought it ought to be worth $400; I told him I would see a party that evening and try and find some one who would go into it, and buy the land * * *. I saw that party that evening that I thought would do that. Jessie D. Baker at that time was stopping at my house in Arapahoe; she is a school teacher by profession; I asked her on that evening if I could take the title to that land in her name; she consented to it. On the morning of the 13th of February, Melancthon Wing came to my office again. He asked me if I had seen any person who would go into the transaction, buy the land." He stated: "I told him I had. He wanted to know if they would give him the $400, in all, for the land. I told him they would. 'Well,' he said, 'then what do you want to do in regard to it.' I want you and your wife to make a warranty deed of your title to that land, * * *. I says, on that basis, that cash proof can be made out; I want you and your wife to make a warranty deed to Jessie D. Baker, to-day; we will go to Bloomington on the evening train, and I will make proof for you, in your name; then I will put the final receipt on record, and then the deed. I told Mr. Wing I was busy that morning, says I, 'you come in, this afternoon, to my office; I will have the papers ready for signing,' or something to that effect; something about having the papers ready; 'and we will have them executed this afternoon.' Mr. Wing came to my office after dinner, that day, and asked me if I had

13

the papers ready; I told him I had; I read him the cash proof that was in there; told him that wouldn't be signed by him or the witnesses until we went to the land office, at Bloomington, that evening; I read him the deed I had all ready when he came in; this deed * * * was filled out when he came in, all but the signatures of Mr. Wing and his wife * * *. After I got done reading, Mr. Wing says, 'I won't sign that deed until I have the money; that is all we are depending upon, and we will not sign that deed until we have the pay.' I said, 'Mr. Wing, here is $400, all told; it will take about $187 of this to go to the United States, and the balance you are entitled to; I will willingly give you this $213 now, and the $187 I will keep until the cash proof is made.' He says, 'Yes, that will be all right, and then you can go to Bloomington on this evening's train.' I says, 'Yes, sir.' I took a roll of bills that was in my vest pocket out, I remember there was some silver and bills; he counted it, and said it was correct, and after he counted it, I handed him the deed at the end of the desk, where he sat, and he signed it. I took the acknowledgment of it."

Mr. Morlan—

Q. "Was Mrs Wing there?"

A. "No, sir. Not at that time; he signed it. I asked him the usual questions, whether it was his voluntary act and deed; he said it was. I didn't write the acknowledgment on the back of the deed just at that time. I asked him at the time, 'Where is your wife.' He said, 'My wife is down the street, I will bring her in.' I says, 'I shall require you to do that right away, that you bring her in, I want this deed filled.' He went out somewhere, I dont know where, I think he was gone quite a little while, I should think three-quarters of an hour. He came back, brought a woman there he said was his wife. I had never seen her before until that day; I read her the deed, told her I had paid Mr. Wing the $213, and I had

$187 in my pocket to make the proof. I asked her if she was ready to sign the deed, and she said she was, and she signed the deed, and I took her acknowledgment, and as soon as I acknowledged it I filled out the back of the deed. It was almost train time; I wanted to get back on the 8 o'clock train that evening, so as to complete the thing that day. That was the understanding all around. I went to the train with Mr. Wing and Mr. Fallert; he is a witness; Mrs. Wing was in the depot. They were living in the section house, B. & M. section house, right opposite the depot, at that time, staying there with the party who was keeping the section house as it was * * * *. We went to Bloomington before Mr. Montgomery [register of land office]. I handed him the cash proof, he looked it over, and he said, 'Have you seen that decision that is just out?' referring to some decision that was just out, or had been out a little while. * * * And he said, 'I will have to reject the cash proof on account of that decision. * * * I told him * * * I would appeal. I told him that we wanted to get home, so he kept the papers, the cash proof, and said he would send back the cash proof to me by the next mail, with his proper rejection, so I could appeal. This is the letter he sent me with the rejection. On the 14th he sent me back the cash proof, and that is the letter of rejection. * * * On the 18th I appealed for Mr. Wing on the rejection of the cash proof by the register and receiver. I also filed a motion for a rehearing of the original contest, so as to attack it in every way, to save the rights of Mr. Wing. * * After this cash proof was rejected, I asked Mr. Wing to return to me this $213, and I would hand him back his deed until such time as this matter could be heard before the commissioner, and was finally settled, so he could make his cash proof. Mr. Wing said he had used considerable of the money, so he couldn't pay it back that day. That is what he claimed. I says, 'That leaves me in a peculiar

position, you have got this money, and it stands altogether on your honor, the way it is now,' or something to that effect; but he refused to give the money back, for the reason stated, but he did say, 'You hold the deed in your safe until the final hearing of the matter before the commissioner, and whenever he decides that I can make the cash proof I will make it just the same.'   *   *   *   He came to my office on the 18th of February.   He signed the appeal on the cash proof, also the motion for rehearing, and I enclosed them to the Bloomington land office."

This witness testified further as to other matters, which testimony will be examined when we reach another branch of the case.

Xavier Spoth, a witness on the part of the defendant, testified that he was present at the office of J. A. Dudgeon, and saw Melancthon Wing sign the deed spoken of by Dudgeon in his testimony, and saw money paid, at that time, by Dudgeon to Wing, but did not know the amount. He did not see Mrs. Elnola Wing sign the deed, nor see her at all at the time.

Bert Dudgeon, a son of Joseph A. Dudgeon, was sworn as a witness on the part of the defendant, and testified that he was present at the office of Joseph A. Dudgeon at the time of the execution of the deed by Melancthon Wing, and saw Joseph A. Dudgeon pay him $213, as the consideration therefor; that he stood behind his father and counted the money after him, etc., and that he afterwards saw Mrs. Wing come in and sign the deed.   He corroborated the evidence of his father in respect to the contract between him and Wing, the payment of the money, and the execution of the deed by both Wing and Mrs. Wing.

It was admitted by both parties on the trial, that Melancthon Wing had the homestead entry on the land described in the pleadings, and proved upon the same, making cash proof under the act of congress of June 5,

1880, and received the receiver's final receipt therefor, and the same was duly recorded in the office of the county clerk, and that afterwards there was a patent duly issued from the United States, for said land, to the said Melancthon Wing, on the 10th day of September, 1886.

The plaintiff offered and gave in evidence a quit-claim deed, executed by Melancthon Wing and Elnola Wing to C. S. Child, of the land in question, dated and acknowledged May 2, 1884. Also a warranty deed of the same land, from the same parties to the same party, dated the 24th day of May, 1884.

E. S. Child, plaintiff, was sworn as a witness in his own behalf, testified that he was acquainted with Melancthon Wing and Elnola Wing, his wife; that he, plaintiff, paid said Wing, personally, $100, besides furnishing the money for the final proof, which was $200, less the $14 which had been paid, a total of $286 that he paid him. I further quote his testimony :

Q. State what knowledge you had of a deed purporting to be executed to Jessie D. Baker, or any other person, to this land, previous to this time, if you had any?

A. Melancthon Wing came into my office making some enquiries about the land law and these claims; he stated in the conversation that he had endeavored to sell the claim to Joseph A. Dudgeon; he had agreed to give him $50, but he failed to make final proof, because of a certain contest made by Mr. Albright, whose attorney I was; he wanted to know if he could pay out while there was a contest pending, and afterwards he made himself known to me. I told him what I had stated to him I regarded as strict fact and law, and he wanted to know then what I would give him for the land if I could make a satisfactory arrangement with the man whose attorney I was in the contest; I told him that it was scarcely a square deal for me to take the land from the man for whom I was hired. I afterwards saw him and satisfied

him with $22 or $23, paying him this amount. In regard to the attorney question, that is all he said, I believe, in regard to that; he said he had made a deed to Joseph A. Dudgeon to secure him in advance for the money to pay up, and he had demanded the deed from him, and Mr. Dudgeon said he had stuck it in the stove, and made that motion, and he said he had burned it up, and as for Jessie D. Baker, her name was never mentioned or in any way thought of at that time.

Q.   When did you first learn of this deed to Jessie D. Baker?

A.   After the final proof had been made, after the quit-claim deed was recorded, the final receipt was recorded, and the warranty deed which I received from Melancthon Wing and wife, subsequent to the time they were all recorded. I was then notified that there was a deed on file conveying the land to Jessie D. Baker.

Q.   After the 12th day of June, 1884?

A.   After the deed was on record, the dates I haven't commmited to memory at all, I thought the deed would be the best evidence. Right immediately after that, after I received this notice—I don't remember just how soon—but after that I requested Mr. Colvin, who was then my partner, to go with Mr. Wing and see this Jessie D. Baker, and see if she knew what was being done, for the fact of the matter was, I don't think she knew anything about what was being done.

I will now call attention to that part of Joseph A. Dudgeon's testimony that tends to prove that, at or before the time of the execution and delivery of the deeds from Wing to the plaintiff, the latter had notice of the deed from Wing to Jessie D. Baker.

Q.   State what conversation you have had, if any, with Mr. Child in regard to the deeds to this land?

A.   On the the 14th of February, 1884, in the morning, I was going up to my office, my son was with me, and

we were both going on the street; I met Mr. Child; he told me he knew all about this cash proof business that was going on, and that some party—he did not know who it was—had a deed to this land done through me; that I was taking his head off on the contest, beating him out; that he would get even with me, or something of that kind; afterwards, before he got his warranty deed, I went to Mr. Childs, where the bankers keep now, in the brick building in Arapahoe now; he had his office there at that time; I went to his office and personally had a talk with him; went in and I told him he knew all about this deed; he admitted he knew all about it, and that he was doing that to beat me. He didn't give me but very little satisfaction; he acted very similar to what he did the first time, but he claimed he knew all about the title some one had, through me he said; he said he didn't care anything about it; he didn't give me any satisfaction."

The above testimony of J. H. Dudgeon, in regard to the meeting and conversation with Mr. Child on the street, was corroborated by the testimony of the witness, Bert Dudgeon.

The plaintiff introduced in evidence the deposition of Melancthon E. Wing, taken before a notary public in Red Willow county, in which he testifies that he then resided in Decatur county, Kansas; that he was the identical Melancthon Wing who made homestead entry on the south-west quarter of section 17, township 3, range 24 west, in Furnas county, Nebraska; that he knew Joseph A. Dudgeon, but did not know Jessie D. Baker, the defendant; that he signed a deed to Joseph A. Dudgeon; that he bargained to Mr. Dudgeon, for the consideration of fifty dollars, that he was to pay out on the land and have a deed; he then made out a deed; "I signed it and then took it down to my wife, and she signed it at our place of abode. He said that we would go down that night and make the proof; he would get a witness, and

he would be one witness. He gave me five dollars to bind the bargain, and stated that it would be too late when we returned that night to have the deed acknowledged, but to come up in the morning and acknowledge the deed and get my money. Next morning I went up to his office and asked him for the balance of the money. He said, ' I can't give you any money, they won't accept the proof.' Says I, ' where is that deed ? ' Says he, 'I shoved that in the fire, burned that up. That was no account.' I said, ' Then our contract is void,' and got up and went out. This was between the 15th and 25th of February, 1884."

I further quote from his deposition :

Q. Did you or did you not ever make or sign a deed to the above tract of land, or any other land, in favor of Jessie D. Baker?

.A. Never.

Q. Did you ever receive any other money than the five dollars you have mentioned from Joseph A. Dudgeon in connection with this transaction ?

A. No, sir.

The plaintiff also introduced in evidence the deposition of Mrs. Elnola Wing, taken at the same time and place as the above, in which she stated that she was unacquainted with the plaintiff, Jessie D. Baker, or with Joseph A. Dudgeon ; that she did sign a deed in the month of February, 1884; that she did not know the contents of the deed; that the date on which she signed it was between the 13th and 25th of February ; that there was no person other than her husband present when she signed the deed ; that she never acknowledged said deed before Joseph A. Dudgeon, or any other person.

Upon her cross-examination she declared that she was never in Joseph A. Dudgeon's law office in Arapahoe, Nebraska ; that she never saw Mr. Dudgeon either conversing with her husband concerning land or otherwise; never saw him at all.

There was an attempt on the part of the plaintiff to impeach the witness, Joseph A. Dudgeon, for credibility, but with no great measure of success.

The case as presented by the record divides itself into two propositions:

1. Does the evidence under the pleadings prove and establish a legal sale and conveyance by Melancthon Wing, the common source of title, to the defendant?

2. Did the plaintiff at the time of his purchase of the land from Melancthon Wing, and the execution and delivery of the two deeds under which he claims the title, or either of them, have notice of the prior conveyance to the defendant, or of such facts in relation thereto as would be sufficient to put a person of ordinary prudence upon such enquiry as would, in the ordinary course of events, have led him to a knowledge thereof?

Our statute, Chapter 73, Sec. 1, Comp. Stat., provides that, "Deeds of real estate or any interest therein in this state, except leases for one year or for a less time, if executed in this state, must be signed by the grantor or grantors, being of lawful age, in the presence of at least one competent witness, who shall subscribe his or her name as a witness thereto, and be acknowledged or proved and recorded as directed by this chapter."

While the deed upon which the defense is predicated runs in the name of Jessie D. Baker, it is not claimed that she has, or ever had, any right or interest in the land other than that of a passive trustee, simply consenting that her name might be used by Mr. Dudgeon, as the depository of the title for the time being. According to Mr. Dudgeon's testimony, he bought the land for himself, and paid for it with his own money, and took the deed in the name of his sister-in-law, without any agreement or promise on her part to pay or account to him for the money. Mr. Dudgeon then was the real owner of the title to be evidenced by this deed, assuming that his testimony is

strictly true. Then was he a competent witness to the deed?

The statute of Connecticut provided that the "subscribing of the name of the grantor" to a deed "shall be attested by two witnesses." · This provision has always been construed to require two attesting witnesses to a deed, both of whom are competent witnesses· in an action at law between the parties to the deed involving the subject-matter of the conveyance. See *Winsted Savings Bank v. Spencer*, 26 Conn., 194, and cases there cited. In that case it was also held that the witness must be "competent" under the law as it stood before the statute empowering parties and interested persons to testify in suits. It is true that this construction is based upon a subsequent clause of said statute, "which provides that it shall not in any manner affect the law relating to the attestation of the execution of last wills and testaments, or of conveyance of real estate, or of any other instrument required by law to be attested." While our statute contains no provision expressly excepting the law relating to the attestation of deeds from the effect of the statute which by implication repealed section 838 of the code of 1855, yet without such excepting clause, I do not think that such repeal had the effect to modify the construction of section 1 of chapter 73, above quoted, as placed upon it, in connection with the section repealed. Chapter 73, Compiled Statutes, was first enacted by the legislature of Nebraska territory as Chapter XXXI., part I. of the code of Nebraska, approved January 26, 1856. It will be remembered that section one of this chapter provides that, "deeds of real estate * * * executed in this state, must be signed by the grantor or grantors * * * in the presence of at least one competent witness." Now what meaning did the legislature attach to the words, "competent witness," as thus used? For an answer to this question we must refer to the statutes as they then stood. In that part of the code enacted

at the previous session of the legislature, headed "Evidence," we find section 838, above referred to, which is in the following words: "838. A person who has a direct, certain, legal interest in the suit is not a competent witness, unless called on for that purpose by the opposite party, as hereinafter provided." This section was then in full force. It was a statute in *pari materia* with the section which we are construing. In it we find probably the only description of a competent or incompetent witness to be found in our local statutes then in existence. Reading the two acts together, then, I construe them to mean that deeds of real estate must be signed by the grantor in the presence of at least one witness, who must not have a direct, certain, legal interest therein, and be otherwise competent.

It is true that the section above quoted has been long since repealed by implication, as above stated, but it was in force when chapter 73 was originally enacted, and its provisions will be presumed to have been in view of the law-makers when they drafted the language of section 1 of that chapter; its repeal, therefore, does not affect the construction thus permanently engrafted upon the said section.

From the foregoing considerations I come to the conclusion that the instrument offered and given in evidence by the defendant as the deed of Melancthon Wing and wife, as accompanied and explained by the testimony of Joseph A. Dudgeon, is not a deed sufficient to convey title, for the want of a competent attesting witness. It may be objected to this conclusion that the interest of the witness is not a direct, certain, legal interest. To that objection I would reply, that it would be a reproach to our law to sanction a proceeding which seeks by indirection to accomplish that which if done directly would be held illegal. Having thus come to the conclusion that the deed cannot be accepted as record evidence of the transfer of the title to

the land under which the defendant claims, it becomes a question of conflicting evidence between the witnesses of the plaintiff and those of the defendant. Of this, it is enough to say that the duty of reconciling this conflict, if possible, devolved upon the trial court, and if such conflict was impossible for the court to reconcile, it then became its duty to adopt that which, under the rules of evidence, was the most worthy of belief and reject the other. From the case before us, I am unable to say that there has been a failure on its part to discharge this duty, which calls upon this court to interpose.

But little need be said upon the second point. Had there been a legal prior conveyance to the defendant, though unrecorded, it would then have become a vital question whether the plaintiff, at the time of accepting the conveyance to himself, had knowledge of its existence or of such facts as would put a man of ordinary prudence upon an inquiry which probably would have led him to such knowledge. But, as we have seen, there was no such conveyance in legal existence. It is not claimed that the plaintiff had notice of the facts and transactions between Wing and Dudgeon, out of which the latter claims an equitable interest in the land; if he had, it is difficult to see that such fact could control the disposition of the case. The judgment of the district court is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.